UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

ENRIQUE LOZADA,

        Plaintiff,

v.                                                                    Case No.  5:07-cv-396-Oc-GRJ

MICHAEL J. ASTRUE, Commissioner of Social
Security,

        Defendant.

_____/

## ORDER

        Plaintiff appeals to this Court from a final decision of the Commissioner of Social

Security (the "Commissioner") denying his application for disability insurance benefits.

(Doc. 1.)  The Commissioner has answered (Doc. 4) and both parties have filed briefs

outlining their respective positions.  (Docs. 16 & 17.)  For the reasons discussed below,

the Commissioner's decision is due to be **REVERSED** and **REMANDED** under

sentence four of 42 U.S.C. §405(g).

## I.  PROCEDURAL HISTORY

        On October 24, 2003, Plaintiff filed an application for disability insurance benefits

claiming a disability onset date of September 12, 2003.  (R. 83-85, 88.)  Plaintiff's

application was denied initially and upon reconsideration.  (R. 49-50, 52-54.)  Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ"), which was held on

January 9, 2006.  (R. 48, 616-638.)  On June 28, 2006, the ALJ issued a decision

denying Plaintiff's claim for disability.  (R. 15-22.)  On August 16, 2007, the Appeals

Council denied Plaintiff's request for review.  (R. 5-7.)  After having exhausted his

administrative remedies, Plaintiff sought judicial review pursuant to 42 U.S.C. § 405(g) and filed his appeal to this Court. (Doc. 1.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1]  Substantial evidence is more than a scintilla in that the evidence must do more than merely "create a suspicion of the existence of [a] fact," and must include "such relevant evidence as a reasonable person would accept as adequate to support the conclusion."[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3]  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

---

[1] *See* 42 U.S.C. § 405(g).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Richardson v. Perales, 402 U.S. 389, 401(1971); Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982)); *accord* Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; *accord* Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding court must scrutinize entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding court must also consider evidence detracting from evidence on which Commissioner relied).

[5] Keeton v. Dep't Health & Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do her previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit her physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in Title 20, Part 404, Subpart P, Appendix 1 of the Code of Federal Regulations, she is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and

---

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505.

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *See* Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] Id. § 404.1520(c).

[11] Id. § 404.1520(d).

[12] Id. § 404.1520(e).

past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14]  The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15]  The Commissioner may satisfy this burden by pointing to the grids for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the grids when the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion.[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide

---

[13] Id. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2.
In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.
Id. (internal citations omitted).

[16] Walker, 826 F.2d at 1002. Once the burden shifts to the Commissioner to show that the claimant can perform other work, the grids may come into play. Id.

[17] Phillips v. Barnhart, 357 F. 3d 1232, 1243 (11th Cir. 2004); Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996); Walker v. Bowen, 826 F.2d 996, 1003 (11th Cir. 1987) ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

range of employment.[18]

The ALJ may use the grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19]  Such independent evidence may be introduced by a vocational expert's testimony, but this is not the exclusive means of introducing such evidence.[20]  Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he is not capable of performing the "other work" as set forth by the Commissioner.[21]

## III. SUMMARY OF THE RECORD EVIDENCE

Plaintiff was born on December 1, 1958 and was forty-eight (48) years old at the time of the final decision. (R. 83, 620.) Plaintiff has a high school education and past relevant work experience as a diesel mechanic and auto parts salesperson.  (R. 622.) Plaintiff contends that he has been unable to work since September 12, 2003, due to degenerative disc disease of the cervical and lumbar spine.  (R. 624.)

Plaintiff was injured during his military service and has a history of degenerative disc disease and degenerative joint disease of the cervical and lumbar pine.  (R. 491, 422.)  On November 20, 1998, a myelogram of the spine was performed and revealed cervical canal stenosis, more prominent at C-5 and C-6 levels, central disc bulges at C4-5 and C5-6 and at L5-S1, a central disc protrusion projecting centrally and to the left of

---

[18] Walker, 826 F.2d at 1003.

[19] Wolfe v. Chater, 86 F.3d 1072, 1077-78 (11th Cir. 1996).

[20] See id.

[21] See Doughty v. Apfel, 245 F.3d 1274, 1278 n.2 (11th Cir. 2001).

the midline, and L3-4 and L4-5 disc bulges. (R. 159-162.) Plaintiff underwent a C7-T1 keyhole laminectomy and foraminotomy. (R. 164-165.) Plaintiff reported that the surgery did not correct the problem. (R. 624.)

Plaintiff also reported that he has hearing loss, headaches and constipation. (R. 189.) Plaintiff opined that his constipation and abdominal pain is directly related to his chronic use of pain medication. (R. 189.) While in the military, Plaintiff's hearing loss was evaluated and there was no recommendation for surgery or hearing aids. (R. 190.)

On August 17, 1999, Plaintiff was evaluated by Dr. Edward Arrington, an orthopedist. (R. 152-154.) Dr. Arrington diagnosed Plaintiff with cervical degenerative disc disease, status post failed laminectomy, laminotomy and foraminotomy and lumbar spine degenerative disc disease with protrusion of L5-S1 disc and facet arthropathy. (R. 154.)

Plaintiff was treated by the Veterans Administration ("VA") from January of 2000 through December of 2005 for degenerative disc disease of the cervical and lumbar spine, including left arm pain. (R. 242-550, 560-609, 416-417.) Plaintiff was diagnosed with left C-8 radiculopathy and neuropathic pain with a probable muscular entrapment/compression component. (R. 234-236.) As of August 2001, Plaintiff complained of constant paresthesia of the left upper extremity, which was constant and worse if he bent his head to the left or bent his elbows. (R. 404-411.) Plaintiff rated his pain an eight out of ten in his neck and described the pain becoming sharp when he moved his head. Additionally, Plaintiff reported that his left arm was weaker and physical therapy made him worse. During this time period, Plaintiff was prescribed narcotic pain medication and underwent acupuncture and laser treatments to control his

pain symptoms. He was referred for pain management with Dr. Shetty. (R. 234, 242-550, 560-609.)

Plaintiff was treated by Dr. Joy Maldonado-Viana, a primary care physician, from August of 2002 through September 15, 2005. (R. 220-241, 553-559,560-610.) On August 21, 2002, Dr. Maldonado noted abnormal examination findings in the musculoskeletal and neck areas, as well as, pain to palpitation of the shoulder and upper back areas. (R. 236.) During this visit, Plaintiff complained of numbness in his left arm. On September 23, 2002, Plaintiff returned to Dr. Maldonado for follow-up care for his cervical and low back pain. (R. 234.) On that day, Dr. Maldonado noted an abnormal musculoskeletal exam, yet stated that there were no acute changes since the last office visit. When Plaintiff returned for treatment in November of 2002, Dr. Maldonado stated that Plaintiff had been non-compliant with office visits. (R. 233.) In September of 2003, Plaintiff returned and had a normal examination. During this visit it was noted that he walked with an unassisted gait, with no limping and there were no acute gross neurological deficits. (R. 231.)

On October 7, 2003, Plaintiff returned to Dr. Maldonado due to a thumb laceration which occurred while Plaintiff was doing the dishes. (R. 229-232.) Plaintiff complained that the cut continued to bleed while he tried to do other things around his home. On September 29, 2004, Plaintiff returned with back complaints and Dr. Maldonado noted that Plaintiff was slow but stable, had an unassisted gait, was in no acute distress, yet, he seemed to guard his back and was limping during the exam. (R. 223.) Dr. Maldonado noted that Plaintiff had limited range of motion in the neck and reproducible tenderness in the shoulder. (R. 223.) According to the Plaintiff, he rated

his pain a 6 or 7 out of 10. Plaintiff was unable to elevate above shoulder height and he demonstrated limited ability with overhead activities; however, his arm and hands had good strength and grip action.

On October 7, 2002, Plaintiff was treated by Dr. Managla Shetty for pain management. (R. 178-180.) Dr. Shetty noted a moderate amount of tenderness in the mid line area around L5-S1 and in the paravertebral area and moderate tenderness in the left cervical paravertebral area with spasm of the left sided trapezius. (R. 179.) Plaintiff had normal c-spine flexion and extension, his motor strength in the upper and lower extremities were 5/5 on all groups of muscles. Dr. Shetty diagnosed cervical post laminectomy with persisting left upper extremity pain with a posterior herniated disc with neuroforaminal narrowing, worse on the left at C5-6 and lumbar radiculopathy. Dr. Shetty referenced the 1998 MRI of the lumbar spine which showed posterior L5-S1 herniated disc. Dr. Shetty recommended that Plaintiff see a neurosurgeon for a surgical opinion and for epidural injections. (R. 180.) Dr. Shetty prescribed Percocet for pain control. Plaintiff took 9 to 12 Percocet and 5000 mg of Tylenol tablets daily. As a result Dr. Shetty counseled Plaintiff about the number of Percocet and Tylenol medications he took daily.

On December 13, 2002, Plaintiff underwent an MRI of the cervical spine. (R. 238.) The MRI showed degenerative changes at C5-6 and C6-7 with spondylosis at this level. There were no focal disc herniation or significant spinal stenosis noted.

On December 18, 2002, Plaintiff was treated by Dr. Antonio DiSclafani, a neurosurgeon. (R. 174.) Dr. DiSclafani noted a positive spurling's sign when he rotated his neck to the left and also observed mild tricep weakness on the left side as well. Dr.

DiSclafani diagnosed Plaintiff with C5-6 and C6-7 cervical spondylosis and he was advised to undergo an anterior cervical diskectomy and fusion. Dr. DiSclafani reported that the area of the "old foraminotomy at C-7-T1 looks fine." (R. 174.)

In February of 2003, Dr. Shetty treated Plaintiff for neck and back pain. (R. 175-177.) On February 27, 2003, Plaintiff reported that the epidural lumbar injections, provided only short pain relief. (R. 176-177.) Plaintiff was prescribed Percocet, and reported that the pain medication was not working well and that the lumbar pain was radiating to both knees. (R. 175-176.)

On May 28, 2003, an x-ray of the lumbar spine revealed minimal degenerative joint disease with small osteophyte formation with well maintained disc height and no evidence of compression. (R. 517.)

From August 2003 through December 2003, Judy Buford, ARNP treated Plaintiff for back pain at the VA clinic. (R. 345, 353-354, 512-514.) On August 6, 2003, an MRI of the lumbar spine showed multilevel disc disease and neural foraminal narrowing which predominated at L2-L3, where there was central disc extrusion and thecal sac compression and caudal nerve roots posteriorly at that level. (R. 513-514.) On September 15, 2003, Plaintiff reported that he was unable to sleep due to pain and he was prescribed Methadone. (R. 354.) On December 31, 2003, Plaintiff complained of gastric and skin issues with the Methadone and his medication was changed to Fentanyl patches for pain and Percocet for breakthrough pain. (R. 345.) Plaintiff began to have side effects from the patches and his medication was again changed to MS Contin. During his treatment at the VA, Plaintiff was prescribed a number of narcotic pain medications for chronic back and neck pain. Plaintiff was prescribed Oxycodone

(Percocet), Trazadone, Morphine, Fentanyl patches, Tylenol #3, and Lorcet.

On November 3, 2003, Plaintiff was examined by Dr. R. Patrick Jacob. (R. 226-229.) Dr. Jacob noted normal range of motion of the lumbar and cervical spine with no appreciable tenderness in either region. (R. 226.) Plaintiff denied radiation of pain down the leg, weakness or numbness. Dr. Jacob opined that while further surgery on Plaintiff's neck would not be appropriate, a discectomy with fusion for his back was recommended. Plaintiff declined to have this surgery performed. (R. 228.)

On January 11, 2004, Dr. David Guttman reviewed the medical record and completed a Physical Residual Functional Capacity Assessment Form. (R.181-188.) The state agency non-examining physician noted that Plaintiff had diagnoses of back pain, depressive disorder, c-spine surgery with no relief, left hand numbness, and narrowing at L2-3. (R. 182.) The non-examining physician found that Plaintiff could lift and carry up to 50 pounds occasionally and 25 pounds frequently; he could sit about six hours in an eight hour workday; he could stand and/or walk about six hours in an eight hour workday; he was unlimited in pushing and pulling in the upper and lower extremities; and had unlimited postural, manipulative, visual, environmental and communicative limitations. (R. 183-187.)

On May 17, 2004, Dr. Nagy Shanawany examined Plaintiff at the request of the Disability Determinations office. (R.189-193.) Dr. Shanawany noted reduced forward flexion of the cervical spine, reduced extension, and lateral flexion was 5-10 degrees. Plaintiff demonstrated diffuse discomfort across the cervical spine. (R. 191.) Dr. Shanawany reported that Plaintiff had decreased range of motion of the thoracolumbar spine, pain with forward flexion, and diffuse discomfort across the lumbar spine with

some localization to the right sacroiliac. (R. 192.) Additionally, Dr. Shanawany stated that a seated straight leg lift test caused a pulling in Plaintiff's calf and he exhibited a positive straight leg raise on supine position at 15 degrees. Plaintiff was unable to lift his left leg off the table due to intense pain. During resistance testing of the upper and lower extremities on the left, there appeared to be some resistance noted but overall this was normal. Dr. Shanawany diagnosed Plaintiff with cervical and lumbar disc disease and joint disease with associated radiculopathy and gastro-reflux disease. Plaintiff's functional assessment showed decreased range of motion in the shoulders and cervical and lumbar spines due to pain. (R. 192-193.) Dr. Shanawany found Plaintiff's gait, grip strength, fine manipulation, hearing and mental status normal. (R. 193.)

On May 19, 2004, Dr. Bruce Borkosky, a psychologist, examined the Plaintiff. (R. 167-173.) Plaintiff reported depression since his Army retirement and after being laid off from work. According to the Plaintiff, he was medically discharged from the Army at 30% disability and was now at 60% disability. (R. 167.) Plaintiff reported his mood as tense, in pain, frustrated, annoyed, a little angry and his insight was poor. (R. 168.) Dr. Borkosky administered the WMS-III to determine Plaintiff's working memory capacity. As estimated by the working memory index, Plaintiff was in the low average range. (R. 169.) Plaintiff's immediate and delayed memory performance scores were in the borderline range and low average range. (R. 171.) Dr. Borkosky diagnosed Plaintiff with adjustment disorder, pain disorder, and features of personality disorder. The prognosis was fair. (R. 172.) Dr. Borkosky opined that Plaintiff had a good ability to remember and carry out instructions and a fair ability to respond appropriately to

11

supervision and co-workers and work pressures.

A Psychiatric Review Technique Form was prepared on June 7, 2004 by Theodore J. Weber, Psy. D. (R. 194-207.) Dr. Weber concluded that Plaintiff had a pain and adjustment disorder. Dr. Weber opined that Plaintiff's mental impairments should be considered in assessing Plaintiff's residual functional capacity. (R 194.) Dr. Weber opined that Plaintiff had mild limitations in activities of daily living, mild limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration. (R. 204.) According to Dr. Weber, Plaintiff's activities of daily living affected by pain were mildly impaired, his socialization was also affected by pain and depression and appeared mildly impaired, and his concentration, persistence and pace depended upon how well his medications were working and based upon objective testing were moderately impaired. (R. 206.)

On June 12, 2004, a second non-examining state agency physician, reviewed the medical record and conducted an RFC assessment. (R. 212-219.) The non-examining physician found that Plaintiff could lift and carry up to 20 pounds occasionally and 10 pounds frequently; he could sit or stand/walk up to six hours in an eight hour day with unlimited pushing and pulling in the upper extremities. (R. 212-213.) Plaintiff could occasionally climb ramps, stairs, ladders, rope or scaffolds, could occasionally stoop or balance, could frequently balance, kneel and crawl and had no environmental limitations but should avoid exposure to hazards. (R. 214-216.)

Dr. Weber prepared a Residual Functional Capacity Assessment Form on June 7, 2004. (R. 208-211.) Dr. Weber opined that Plaintiff had moderate limitations in the

12

ability to carry out short simple instructions; moderate limitations in the ability to carry out detailed instructions; moderate ability to maintain attention and concentration for extended periods, moderate limitation in the ability to work in coordination with or proximity to others without being distracted by them; moderate limitation in the ability to complete a workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; moderate limitations with the ability to respond appropriately to criticism from supervisors; moderate limitation to set realistic goals or to make plans independently of others and that. (R. 208-209.)

Plaintiff underwent a psychiatric assessment on September 15, 2004 performed by Nancy Morris, R.N. of the VA clinic. (R. 312-316.) Plaintiff stated he did not want to be around others and felt like an empty shell. (R. 312.) Plaintiff complained of difficulty falling asleep and staying asleep due to nightmares and night sweats and reported experiencing isolative behavior. Plaintiff reported that he was irritable, had swift mood swings to anger and found that Percocet increased his mood swings. The mental status examination revealed slowed movements, a sad mood, and an anxious and depressed affect. (R. 315.) Plaintiff was diagnosed with depression and was referred for treatment with Dr. Ruffin.

On September 17, 2004, Dr. William Ruffin, a VA psychiatrist, examined Plaintiff. (R. 289.) Plaintiff reported experiencing irritability, difficulty with sleep, and not wanting to be around people. According to Plaintiff, he stopped taking Remeron due to twitching at night and drowsiness during the day. Dr. Ruffin changed his mediation to Trazadone. Dr. Ruffin noted that his affect was flat and withdrawn. Plaintiff was oriented in all three

13

spheres and exhibited intact memory, appropriate judgment and average or above average intellect.

That same day, on September 17, 2004, Dr. Lalitha Green a rehabilitation medicine consultant, examined Plaintiff. (R. 290.)  Plaintiff complained of constant low back pain and pain in his left arm and biceps area.  During the examination, Plaintiff complained of pain in his low back during the hip examination but he was able to sit with his legs extended and in his lower extremities his range of motion and strength was normal.   According to Dr. Green, Plaintiff was cooperative, his gait was normal, he was able to walk on his toes and heels slowly and his standing balance was normal.  In the upper extremities, Plaintiff's range of motion and strength were normal.  Dr. Green noted that his active range of motion was restricted in his cervical spine in all planes except anterior flexion and he had pain in extremes of movement.  However, his trunk lateral flexion and rotation to the right and left were normal.  Additionally, Dr. Green reported limitations of the lumbar spine anterior flexion and extension due to pain. Plaintiff was diagnosed with chronic upper and low back pain and referred for a full functional capacity evaluation by an occupational therapist, Bruce Mueller.

A functional capacity evaluation was performed on September 19, 2004 by Bruce Mueller, an occupational therapist. (R. 291-308.)  Mr. Mueller opined that Plaintiff could work at the light physical demand level for an eight hour day.  His acceptable leg capacity was twenty pounds and torso lift capability was zero.  (R. 291.)   Mr. Mueller concluded that Plaintiff was unable to return to his usual and customary job as a diesel mechanic.  According to the occupational therapist, Plaintiff should avoid bending due to his back, avoid climbing ladders, and avoid torso lifting (using a back lift with the legs

straight) as this type of lifting would aggravate his condition.  Additionally, the report noted that Plaintiff needed to avoid extremes of neck postures and repetitive neck movements and sustained overhead work.

On October 6, 2004, Dr. Joy Maldonado-Viana completed a medical source statement regarding Plaintiff's ability to do work-related activities. (R. 220-222.)  Dr. Maldonado opined that Plaintiff occasionally could lift and carry ten pounds and frequently lift and carry less than ten pounds, could stand or walk at least two hours in an eight hour workday and could possibly sit four to six hours a day if periodic changes with rest.  (R. 220-221.)  Dr. Maldonado stated that Plaintiff needed periodically to alternate sitting and standing to relieve pain or discomfort. Plaintiff was limited in pushing and pulling in upper and lower extremities and could not perform repetitive pushing or pulling in the upper extremities.  (R. 221.)  Dr. Maldonado noted that Plaintiff could never climb, could occasionally balance and kneel, and was limited in reaching in all directions including overhead and handling (gross manipulation).  Dr. Maldonado also stated that Plaintiff's "daily performance capacity for work might be impaired secondary to the use of narcotic medications."  (R. 221.)  According to Dr. Maldonado, Plaintiff had environmental limitations to temperature exposure, noise, dust, vibrations, humidity, machinery, heights and fumes, odors, and chemicals.  (R. 222.)  Dr. Maldonado noted that Plaintiff had a history of tinnutis with decreased hearing acuity of the left ear.  Dr. Maldonado concluded that Plaintiff's prognosis was guarded and the duration of impairments were permanent with limited improvement expected.

Dr. Maldonado treated Plaintiff on December 16, 2004.  (R. 557-559.)  Dr. Maldonado reported that Plaintiff walked with a limp but did not seem to be in severe

pain.  (R. 557.)  Dr. Maldonado noted that Plaintiff was alert, oriented in all three spheres, pleasant, and cooperative.  Dr. Maldonado noted normal examination findings with no edema or cyanosis.

On January 5, 2005, Plaintiff was treated by Thomas Hundersmarck, Ph. D. (R. 270-271.)  Plaintiff reportedly had stopped taking his medications due to side effects. (R. 270.)  Plaintiff stated that he had to take more and more of the medications to get any effect and then was "zonked for the next day."  (R. 270.)  Plaintiff reported anxiety due to being a passenger in a car and reported nightmares due to the Gulf War. Plaintiff admitted that he avoids others when he was depressed and that his depression made his pain feel worse.  Dr. Hundersmarck diagnosed Plaintiff with "depression versus mood disorder due to medical condition with depressive features."  (R. 270.)  Dr. Hundersmarck assigned Plaintiff a Global Assessment of Functioning ("GAF") of 60 and was referred for pain management and to a psychologist at the Leesburg VA clinic.  (R. 271.)

On February 18, 2005, Joshua Fuhrmeister, a resident at the VA pain clinic, examined Plaintiff for chronic pain. (R. 253-260.)  During the examination, Plaintiff had a slightly antalgic gait and slight tenderness in the lower lumbar spine.  (R. 257-258.) Plaintiff was diagnosed with disc displacement with disc protrusion at L2-3 with neural foraminal narrowing at L2-5.  (R. 259.)  Plaintiff was referred for acupuncture therapy and epidural steroid injections.

Dr. Maldonado re-examined Plaintiff on August 2, 2005 .  (R. 555-556.)  Dr. Maldonado reported that Plaintiff had a slowed pace and guarded his back.  Plaintiff complained of tenderness to touch and pain with range of motion to his back.  Dr.

Maldonado noted there was no "gross bulge/deformity of spine" but there was a limited range of motion. (R. 555.) Plaintiff was started back on Percocet and referred to his neurosurgeon. Dr. Maldonado noted that Plaintiff disappears and returns when he feels bad. (R. 555.) On September 15, 2005, Dr. Maldonado reported that Plaintiff had a stable gait, he was oriented times three. Plaintiff had right sided lower extremity radiculopathic pain. (R. 554.)

On August 9, 2005, an MRI of the lumbar spine revealed that at L2-3 there was loss of disc hydration, with a disc bulge and spondylosis, at L3-4 there was loss of disc height and hydration with a herniation in combination with hypertrophy of facet and ligamentum flavum producing central and bilateral recess stenosis with bilateral and foraminal stenosis. (R. 237.) The MRI further showed that at L4-5 there was loss of disc height and hydration with a herniation in combination with ligamentum flavum which produced central stenosis and at L5-S1 there was loss of disc hydration, disc bulge and spondylosis.

On August 16, 2005, Plaintiff was re-evaluated by Dr. Antonio DiSclafini. (R. 551.) Plaintiff explained that his pain had gotten to the point where it was incapacitating to him and he had tried physical therapy, acupuncture and epidural injections with no relief. During the examination, Dr. DiSclafani noted that forward bending was more painful than hyperextension and a recent MRI revealed degenerative disc disease at L2-5. Plaintiff was diagnosed with mechanical back pain, which was non-surgical, and he was referred for pain management.

Dr. Anita Szady examined Plaintiff on October 12, 2005. (R. 568.) Plaintiff reported that Percocet made him edgy and he was depressed due to his inability to get

17

a job.  Plaintiff stated that he was unable to get hired due to the narcotics he was taking.
Dr. Szady changed Plaintiff's medications from Percocet to Lortab and encouraged
Plaintiff to continue with physical therapy.

After the ALJ issued his decision, Plaintiff submitted a functional assessment
prepared on March 14, 2007, by Dr. Mark Knapp, of the VA clinic. (R. 613-616.)  Dr.
Knapp opined that Plaintiff could occasionally and frequently lift and carry less than ten
pounds, he could stand, sit, or walk less than two hours in an eight hour day, he had a
limited ability to perform pushing and or pulling with his upper and lower extremities due
to lumbar disc stenosis and bulging disc.  (R. 613-614.)  According to Dr. Knapp,
Plaintiff was totally disabled, he could never climb, balance, kneel, crouch or crawl and
was limited in his ability to reach, handle, finger and feel due to chronic cervical pain.
(R. 614.)  Plaintiff was also limited in exposure to temperature extremes, noise, dust,
vibration, humidity, hazards, and fumes.  Dr. Knapp stated further that Plaintiff's
prognosis was poor due to chronic pain syndrome and medical improvement was not
expected.

Plaintiff testified on his own behalf at the administrative hearing held on January
9, 2006.  (R. 620-630.)  Plaintiff testified that he was 47 years of age  (R. 620) and has
a driver's license but only drives once or twice a month.  (R. 620-21.)  Plaintiff's adult
daughter drove him to the hearing. She takes care of Plaintiff and does the shopping,
cooking, laundry and house cleaning.  (R. 620, 626.)  Plaintiff was in the United States
Army for 20 years and is medically retired.  (R. 621.)  Plaintiff testified that his past
relevant work was a diesel mechanic and a counter parts person.  (R. 621-622.)
Plaintiff described his duties as an auto part salesperson as answering phones and

checking the inventory to determine whether or not the parts were in stock.  (R. 623.)
Plaintiff reported that he was laid off due to budget constraints.  Plaintiff has not worked
since September 12, 2003.

Plaintiff testified that he has been diagnosed with cervical degenerative disc
disease in the neck and lumbar degenerative disc disease.  (R. 624.)  Plaintiff stated
that he is in excruciating pain all of the time, that he cannot bend or lift and he lives off
of pain medication.  Plaintiff stated that he experiences pain in the back, both legs, left
arm, head and stomach.  (R. 627.)  Plaintiff described pain that radiated into his legs to
the knee area.  (R. 628.)  Plaintiff explained that the pain is sharp, constant at times and
some days is worse than others causing him to be unable to walk or get out of bed.
Plaintiff stated that he takes his pain medications three times a day.  Plaintiff stated that
his pain medication is strong and it effects his ability to function, causing sleepiness,
insomnia, irritability, constipation, confusion, blurred vision and headaches.  (R. 624,
629.)

Plaintiff reported that he had unsuccessful neck surgery in 1998 and has been on
pain medication since that time.  Plaintiff was prescribed a cane in 2004.  (R. 624-25.)
Plaintiff testified that he lives by himself, uses a shower chair and a hand held shower to
bathe, does not cook, do laundry, grocery shop or clean.  (R. 625-26.)  Plaintiff can
prepare meals that can be cooked in a microwave oven or he eats sandwiches.  (R.
626.)  Plaintiff stated that he does not belong to any clubs nor does he attend church.
(R.626-27.)

Plaintiff described his functional abilities to include, the ability to sit 15-20 minutes
at a time, the ability to stand 15-20 minutes at a time, an ability to walk one block with

the use of a cane, the ability to lift a gallon of milk but not repeatedly, and he is unable to bend.  (R. 629-630.)  Plaintiff testified that he has experienced depression since 1998. (R. 627, 630.)  Plaintiff reported that the medication makes him edgy, snappy, and moody.  (R. 630.)

The ALJ determined that Plaintiff suffered from the severe impairments of degenerative disc disease of the cervical and lumbar spine. (R. 17.)  The ALJ evaluated the record regarding a possible mental impairment but did not  find Plaintiff's depression a severe impairment. (R. 20.)  The ALJ determined that Plaintiff's depression was not severe because it only resulted in mild restrictions of activities of daily living due to his pain, mild difficulties in maintaining social functioning because of his depression, and mild difficulties in maintaining concentration, persistence or pace.

The ALJ then determined that Plaintiff did not have an impairment or combination of impairments which met or medically equaled one of the impairments listed in Appendix 1, Subpart P of Social Security Regulation No. 4.   (R. 20.)

The ALJ evaluated Plaintiff's subjective complaints and symptoms, including his allegations of depression and determined that the clinical findings from these impairments do not appear to be of a degree which is capable of producing limitations of an incapacitating proportion.  (R. 22.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform light work.  (R. 20.)  The ALJ determined that Plaintiff had the left lift capability of 20 pounds and a torso lifting capability of  zero pounds.  The ALJ found that Plaintiff should avoid bending and climbing ladders but can occasionally climb stairs.  The ALJ included a restriction that Plaintiff should avoid torso lifting and extremes of neck

postures and repetitive neck movements and sustained over head work.  Based upon these limitations, the ALJ concluded that Plaintiff could perform his past relevant work as an auto parts salesperson and determined that Plaintiff was not disabled.  (R. 22.)

To determine whether Plaintiff could perform his past relevant work, the ALJ enlisted Robert San Filippo, a vocational expert ("VE").  Upon request from the ALJ, the VE described Plaintiff's past work experience as an auto parts salesperson as light, skilled work.  (R. 632.)  Based upon this testimony, the VE testified that Plaintiff could perform this past relevant work.  (R. 632.)

In her decision, the ALJ referenced the Dictionary of Occupational Titles ("DOT") which provides that an auto parts salesperson is classified as semi-skilled work and has a strength requirement for light work activity.  (R. 22.)  The ALJ determined that Plaintiff was capable of performing his past relevant work as an auto parts salesperson and that this work does not require the performance of work-related activities precluded by the Plaintiff's RFC.  (R. 22.)  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time from September 12, 2003 though the date of the ALJ's decision.  (R. 22.)

## IV.  DISCUSSION

Plaintiff raises  three issues. First, Plaintiff argues that the ALJ erred in finding that Plaintiff's medications did not have side effects and by failing to evaluate how the side effects from the medication impacted Plaintiff's ability to perform sustained work. Second, Plaintiff contends that the ALJ erred by failing to articulate good cause for rejecting the opinion of Plaintiff's treating physician, Dr. Maldonado.  Finally, Plaintiff argues that the ALJ erred by finding that Plaintiff did not suffer from a severe mental impairment.

**A.** **The ALJ Erred In Finding That There Were No Reported Side Effects From Plaintiff's Medications And In Failing To Evaluate The Effect of the Side Effects on Plaintiff's RFC**

Plaintiff contends that the ALJ erred in finding that Plaintiff did not have side effects from his medications and erred by failing properly to evaluate the impact of the side effects on Plaintiff's ability to perform sustained work. The Court agrees.

An ALJ has a duty to investigate the possible side effects of medications taken by a claimant and to consider those side effects of medications when evaluating a claimant's residual functional capacity.[22] Consideration of side effects from medication is particularly appropriate, where, as here, a claimant complains of side effects and the side effects are noted by the medical sources.[23]

At the hearing, Plaintiff testified that he was taking narcotic pain medication, specifically, Vicodin, three times daily, Morphine Sulphate, two times daily, and Flexerel, a sleep aid. (R. 628-629.) Plaintiff testified that as a result of taking these medications, he became groggy, sleepy, had blurred vision and headaches, insomnia, irritability, constipation, confusion, and had difficulty functioning. (R. 624, 629.) The medical record contains numerous notations that Plaintiff takes large amounts of pain medication, some days taking up to 9 to 12 Percocet tablets and 5,000 mg of Tylenol. (R. 180.)

Despite the wealth of evidence in the record that Plaintiff took large amounts of pain medications - and experienced a variety of difficulties from the medications - the

---

[22] *See* Lipscomb v. Comm'r of Soc. Sec., 199 Fed. Appx. 903, 906 (11th Cir. 2006)(unpublished), *citing* Cowart v. Schweiker, 662 F.2d 731, 737 (11th Cir. 1981).

[23] Cowart, 662 F.2d at 737.

ALJ found that "there are no reported side effects from any medication." (R. 22.) This statement is completely at odds with the record, which is replete with complaints of side effects from medication.

For example, in Plaintiff's initial application for disability, Plaintiff noted that his narcotic pain medication caused drowsiness, constipation and that it "knocked" him out. (R. 103.) The medical evidence submitted to the ALJ also discloses that Plaintiff - on his own - discontinued his pain medications on at least two occasions due to side effects. (R. 227, 557, 559.) In addition to this evidence, the treatment records extensively document that Plaintiff consistently complained that the medications caused side effects, such as drowsiness (R. 289, 443), vision changes (R. 266, 277), mood changes (R. 266, 312), irritability or feeling on edge (R. 289, 312, 568), a rash (R. 345, 347), itching (R. 335), memory loss (R. 190), constipation, hypothermia and psychological manifestations (R. 335), an inability to focus (R. 190), twitching, (R. 289), sweating (R. 347), the jitters (R. 347), gastrointestinal problems (R. 345) and caused him to "zonk" out. (R. 270.) Notably, because of these types of problems Plaintiff experienced from the side effects, Plaintiff's medications were changed on at least five occasions. (R. 266, 289, 345, 347, 568.)

Additionally, on October 6, 2004, Dr. Maldonado filled out a medical source statement of ability to do work-related activities form. (R. 220-222.) Dr. Maldonado noted that Plaintiff's daily performance capacity for work might be impaired two hours daily due to the use of narcotic pain medications. (R. 221.) On January 27, 2006, Dr. Maldonado noted in a letter that Plaintiff was taking Percocet and Morphine tablets as needed and that "any patient under chronic pain medication is subject to...side effects,

such as, sedation, lightheadedness, dizziness, vomiting, respiratory depression...and... these side effects might affect...sensory and motor skills." (R. 610.) Finally, during the hearing, in response to questioning by the Plaintiff, the VE testified that confusion, sleepiness, and vision difficulty would have an impact on Plaintiff's ability to perform work on a continuous, uninterrupted basis because Plaintiff would be impaired two hours out of an eight hour workday. (R. 636.)

Accordingly, the ALJ's statement that there were no reported side effects from medication is not supported by any substantial evidence in the record and indeed is directly in conflict with the wealth of evidence that the Plaintiff experienced numerous on-going side effects from the large amount of pain medication he was taking. Because the ALJ erred in his finding that there were no reported side effects from medications the ALJ did not evaluate and take into account these side effects in making her RFC determination of Plaintiff's ability to engage in work related activities. This matter is, therefore, due to be remanded to the Commissioner for proper consideration of the side effects of Plaintiff's medications as part of the evaluation of Plaintiff's residual functional capacity and the determination of whether Plaintiff could perform his past relevant work.

**B. Other Issues**

Although this case is due to be remanded because of the ALJ's error in failing to evaluate the side effects of medication the Court will briefly address Plaintiff's second and third argument.

Plaintiff's challenge to the ALJ's decision to accord only some weight to the opinion of Plaintiff's treating physician, Dr. Maldonado - and instead accord "significant weight" to the opinions of the non-examining state agency physicians, and "controlling

weight" to the opinion of Bruce Mueller, an examining occupational therapist - can be disposed of easily because Plaintiff provided a medical source statement of Dr. Mark Knapp, after the ALJ's decision, which would have a significant impact on the weight accorded to the opinion of Dr. Maldonado.  In his opinion the ALJ found that the non-examining physicians' opinions were consistent with the medical evidence of record and that Bruce Mueller's opinion was accorded significant weight because he had the opportunity to physically examine the Plaintiff.  The ALJ found that Dr. Maldonado's opinion was accorded only some weight because the objective medical records did not completely support such severe restrictions and  because Dr. Maldonado's opinion was inconsistent with the regular treatment documents in the VA records.

While there may be some appeal to Plaintiff's argument that the ALJ's evaluation of Dr. Maldonado's opinion and medical records was flawed, the Court does not need to decide this issue because after the ALJ issued his decision, Dr. Mark Knapp, a VA physician provided a medical source statement of ability to do work-related activities dated March 14, 2007 in which he found that Plaintiff could occasionally and frequently lift and carry less than ten pounds, could stand, sit, or walk less than two hours in an eight hour day, and had a limited ability to perform pushing and or pulling with his upper and lower extremities due to lumbar disc stenosis and bulging disc. (R. 613-614.) Further, while not binding on the ALJ, Dr. Knapp found that Plaintiff was totally disabled, and could never climb, balance, kneel, crouch or crawl and was limited in his ability to reach, handle, finger and feel due to chronic cervical pain.  (R. 614.)  Dr. Knapp opined that Plaintiff's prognosis was poor due to chronic pain syndrome and medical improvement was not expected.

Accordingly, because the ALJ did not have the benefit of Dr. Knapp's medical source statement, on remand the ALJ should address and evaluate Dr. Knapp's opinion in conjunction with his evaluation of the other medical evidence, including the opinion of Dr. Maldonado.

The result is different, however, with regard to Plaintiff's argument that the ALJ erred by finding Plaintiff did not suffer from a severe mental impairment and in discrediting the opinions of the state agency experts.

In order to establish that a mental impairment is severe a claimant must show that the mental impairment significantly limits a claimant's abilities to do basic work activities. Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.[24] In addition, in order to be considered a severe impairment, the impairment must last for a continual period of at least twelve months.[25]

Plaintiff failed to satisfy this standard. The evidence of record concerning Plaintiff's depression was thoroughly discussed by the ALJ in her decision and the ALJ provided well supported reasons why the disorder was not included as a severe impairment. The evidence did not establish that Plaintiff's depression imposed any

---

[24] 20 C.F.R. §§ 404.1521(b), 416.921(b).

[25] 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a), 404.1509, 404.1520(c), 416.905(a), 416.909, 416.920(c); see also, Barnhart v. Walton, 535 U.S. 212 (2002)(noting that a claimant's impairment(s) must last for at least twelve months).

significant limitations on his mental ability to do work-related activities.

The claimant points to three pieces of evidence in support of his argument that his depression was a severe impairment: (1) notes from out-patient treatment records containing a diagnosis of depression and a Global Assessment of Functioning ("GAF") of 60, on January 5, 2005; (2) Dr. Weber's opinion that Plaintiff had mild limitations in activities of daily living, mild limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence or pace and no episodes of decompensation of extended duration; and (3) the diagnostic impression of depression given during a psychiatric assessment on September 15, 2004 performed by Nancy Morris, R.N. of the VA clinic.

The ALJ discussed and considered this evidence and relied upon the opinion of the examining state agency psychologist and concluded that Plaintiff experienced mild limitations due to depression and did not have a severe impairment.

Plaintiff was assessed by Thomas Hundersmarck, Ph. D. (R. 270-271.) The notes from this visit disclosed a GAF of 60 and Plaintiff reported anxiety and depression which made his pain feel worse. While moderate symptoms or a moderate impairment are necessary for a GAF of 60, less than three weeks later during a follow-up appointment Plaintiff stated that he had been doing well and denied that his depressed mood was predominant. (R. 262.) In fact, Plaintiff stated that his depression was secondary to his chronic pain and that he did not feel the need for a mental health consultation follow-up. A GAF reflects the Plaintiff's mental state on a particular date and is not in and of itself evidence that the Plaintiff's mental functioning would be expected to last twelve or more continuous months at the given GAF.

In deciding that the Plaintiff's mental impairment was not severe the ALJ accorded great weight to the consultative psychological examination by Dr. Bruce Borkosky, a psychologist. The report of the consultative examination does not contain any information suggesting that Plaintiff has a severe mental impairment. (R. 167-173.) To the contrary, Dr. Borkosky's report established that the Plaintiff does not have any significant mental work related limitations, despite a diagnosis of adjustment disorder, pain disorder, and features of personality disorder. Dr. Borkosky found that Plaintiff had a good ability to remember and carry out instructions and a fair ability to respond appropriately to supervision and co-workers and work pressures. Dr. Borkosky's report discloses that the Plaintiff was alert, oriented, his recent memory was good, concentration and persistence were fair, he demonstrated average intellectual ability, his immediate and long term memory were normal and there were no psychotic symptoms reported.

Consistent with the ALJ's conclusion that Plaintiff's depressive symptoms did not cause any worked related limitations, Dr. Borkosky noted that Plaintiff's math skills were good, he exhibited comprehension of simple commands, he followed three stage commands, he wrote a sentence with a noun, verb and object, he named the days of the week forward and backwards, as well as the months forward. (R. 168.) Although Plaintiff's fund of general information was fair at best, Dr. Borkosky noted that Plaintiff's recent memory was good and he recounted recent news as "the nonsense going on in Iraq." Finally, Dr. Borkosky noted that Plaintiff's judgment was good.

While the report offered a diagnosis of adjustment disorder, pain disorder, and features of personality disorder, based upon Dr. Borkosky's testing and examination,

28

the ALJ found that Plaintiff had only mild restrictions of activities of daily living due to his pain, mild difficulties in maintaining social functioning because of his depression, and mild difficulties in maintaining concentration persistence of pace based on his working memory tests.  (R. 169-173.)  Generally, if the degree of limitation in the first three functional areas are "mild" and there are "none" in the fourth area, the impairment is not considered  severe.[26]

In addition to the fact that the ALJ thoroughly analyzed and discussed the evidence relating to Plaintiff's depressive disorder, the ALJ expressly discussed the fact that she accorded little weight to the state agency psychologist Dr. Weber as he did not have the opportunity to examine Plaintiff personally.  Generally, the ALJ will give more weight to opinion of a source who has examined a Plaintiff than to a source who has not examined the Plaintiff.[27]  Further, when the opinions of a non-examining, reviewing physicians are contrary to those of examining physicians, they are entitled to "little weight in a disability case, and standing alone do not constitute substantial evidence."[28]

Lastly, Plaintiff noted that during a psychiatric assessment on September 15, 2004, Plaintiff displayed slowed movements, a sad mood, anxiety and a depressed affect.  Plaintiff was diagnosed with depression. However, post-traumatic stress disorder was ruled out and Plaintiff was referred for treatment with Dr. Ruffin, a psychiatrist with the VA hospital.  Although Dr. Ruffin noted that Plaintiff's affect was flat and withdrawn,

---

[26]  20 C.F.R. § 404.1520(a)(d)(1).

[27]  20 C.F.R. § 404.1527(d)(1).

[28]  <u>Sharfaz v. Bowen</u>, 825 F.2d 278, 280 (11th Cir.1987).

Dr. Ruffin found that Plaintiff was oriented in all three spheres and exhibited intact memory, appropriate judgment and average or above average intellect. (R. 289.)

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards[29] and whether the findings are supported by substantial evidence.[30] Accordingly, based on this standard, the Court concludes that the ALJ thoroughly discussed the evidence in reaching his conclusion that Plaintiff did not have a severe mental impairment and her decision was supported by competent substantial evidence. The Court's conclusion is academic, however, in view of the fact that on remand the ALJ will be required to conduct a new hearing and issue a new decision based upon all of the evidence submitted.

## V. CONCLUSION

In view of the foregoing, the decision of the Commissioner is due to be **REVERSED and REMANDED** under sentence four of 42 U.S.C. § 405(g) to the Commissioner, for an Administrative Law Judge to: (1) properly consider Plaintiff's medications and the possible side effects when evaluating Plaintiff's residual functional capacity; (2) consider the medical source statement provided by Dr. Mark Knapp; and (3) conduct any additional proceedings the Commissioner deems appropriate. The Clerk is directed to enter judgment accordingly, consistent with this Order and to close

---

[29] McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988).

[30] Richardson v. Perales, 402 U.S. 389, 390 (1971).

the file.

**IT IS SO ORDERED.**

**DONE AND ORDERED** in Ocala, Florida, on March 30, 2009.

GARY R. JONES
United States Magistrate Judge

Copies to:
    All Counsel